UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

ALFRED MOON, ALFRED MOON, JR.,
CHERYL MOON and MEGAN WHITE,

    Plaintiffs/Counter-Defendants,

v.                                                      CASE NO. 8: 13-cv-02782-EAK-EAJ

MEDICAL TECHNOLOGY ASSOCIATES,
INC.,

    Defendant/Counter-Claimant.
_____/

## ORDER

This cause comes before the Court on remand from the United States Court of Appeals for the Eleventh Circuit. (Doc. # 60). The Eleventh Circuit vacated the Court's previous Order Granting in Part and Denying in Part Defendant/Counter-Claimant's, MEDICAL TECHNOLOGY ASSOCIATES, INC., ("MTA") Motion for Preliminary Injunction, (Doc. # 35), and directed the Court to hold an evidentiary hearing on the Motion for Preliminary Injunction (the "Motion"). (Doc. # 8). After conducting a hearing on the merits of the Motion from October 28, 2014, through October 29, 2014, accepting testimony and evidence from both Plaintiffs and Defendant, reviewing the parties' respective proposed findings of fact and legal arguments associated therewith, (Docs. ## 119, 121), and considering the testimony and evidence in light of the burdens associated with obtaining a preliminary injunction, the Motion is **DENIED**.

### FINDINGS OF FACT

    **A. The Parties**

MTA is a national healthcare compliancy testing, service, and equipment provider, with offices and service centers located throughout the United States. (Docs. # 119 at 2; # 121 at 2). MTA provides medical gas pipeline equipment, repairs, and services to numerous businesses in the healthcare community, as well as system testing and construction certification, preventative maintenance programs, medical gas pipeline full system repair and service, medical air compressor and vacuum pump rebuild services, and ventilation surveys of critical care areas, patient rooms, operating rooms, and laboratories. (Docs. # 119 at 2; # 121 at 2). MTA also markets and sells medical gas plumbing certification courses. (Docs. # 119 at 2; # 121 at 2).

On July 7, 2008, MTA purchased Moon Medical, Inc.'s ("Moon Medical") tangible and intangible assets, including goodwill and its entire list of customers from Mr. Alfred Moon ("Mr. Moon") and Mrs. Cheryl Moon ("Mrs. Moon")—the sole shareholders, directors, and officers at Moon Medical. (Docs. # 119 at 2; # 121 at 2–3). Mr. and Mrs. Moon, their daughter Megan White ("Ms. White"), and their son Alfred "Chip" Moon, Jr. ("Mr. C. Moon") (collectively the "Respondents"), were all employees of Moon Medical. (Docs. # 119 at 3; # 121 at 3–4). Moon Medical was a direct competitor of MTA.

As part of this transaction, MTA employed the Respondents: Mr. Moon became regional manager for MTA's Midwest region, which included Kansas, Missouri, Nebraska, and Iowa. (Docs. # 119 at 3; # 121 at 3). MTA later promoted Mr. Moon to director of field development, which had a national scope. (Docs. # 119 at 3; # 121 at 3). MTA employed Mrs. Moon in an administrative capacity, in which Mrs. Moon primarily produced reports and answered phones. (Docs. # 119 at 3; # 121 at 4). Mrs. Moon also worked on project-related work for Blake Petrunick, then CEO of MTA. (Doc. # 107-3 at 12:7–20). Mrs. Moon had little-to-no contact with customers. (Doc. # 107-3 at 13:4–13). MTA employed Ms. White as the bid and special

sales/project management, where she handled bidding, inside sales, scheduling, and customer service. (Docs. # 119 at 3; # 121 at 3–4). MTA initially employed Mr. C. Moon in the position of field technician for medical gas verifications, and later promoted him to facility sales, in which he conduct certifications and annual inspections. (Docs. # 119 at 3; # 121 at 3). The Respondents were responsible for MTA's Midwest Region, although each individual also worked for particular longtime customers of Moon Medical. (Docs. # 119 at 3; # 121 at 3).

Mrs. Moon's employment with MTA ended on May 31, 2010. (Docs. # 119 at 3; # 121 at 4). Mr. Moon, Ms. White, and Mr. C. Moon resigned from MTA employment by October 2013. (Docs. # 119 at 3–4; # 121 at 11).

B.  The Respondents' Agreements

In consideration for MTA's purchase of Moon Medical, Mrs. Moon executed a contract with MTA that contained restrictive covenants. (Docs. # 119 at 4; # 121 at 4). In addition to a confidentiality provision, Mrs. Moon's agreement provides the following:

> 2.  **Non-Compete.** … [F]or a period of sixty months following the termination…of her employment, Employee shall not, directly or indirectly…render services…to…any person engaged in…any other business whose products or activities compete in whole or in part with the business of [MTA] in any county which [MTA] has sold products or services during the sixty (60) months immediately preceding the signing of this Agreement ("restricted territory")….
>
> 5.  **Non-Solicitation.** … Employee…will not, directly or indirectly, solicit the business of any person known to Employee to be a customer of [MTA], whether or not Employee had personal contact with such person, with respect to products or activities which compete in whole or in part with [MTA].

(Docs. # 119 at 4; # 121 at 4).

Between January 18, 2013, and March 1, 2013, the remaining Respondents—Mr. Moon, Mr. C. Moon, and Ms. White—entered into employment agreements with MTA that contained

restrictive covenants in consideration for their continued employment and respective promotions.

(Docs. # 119 at 5–7; # 121 at 6–8). The employment agreements provide, in pertinent part:

> 3. CONFIDENTIALITY AGREEMENT. Employee… acknowledges that during the course of his…employment Employee has had and will continue to have access to confidential information related to the Employer's business that Employee agrees to keep confidential at all times…"Confidential Information" shall be defined as information of any kind, nature or description concerning matters affecting or relating to the business of Employer, …that is not generally available to the public…Employer and Employee …agree that the protection of Employer's Confidential Information is necessary to protect and preserve the value of Employer's business and its goodwill, and that this Confidential Information, if disclosed, could place Employer at a competitive disadvantage. Therefore, with respect to this Confidential Information, Employee agrees as follow [sic]:
>
>> a. Employee will not, …after the term of his employment: (i) publish, disclose, or make accessible any Confidential Information…whether or not such information is embodied in writing or other physical form or is retained in the memory of Employee…; or (ii) use or generate benefit from such information, except during employment with Employer and for the benefit of Employer….
>>
>> b. Employee shall return all tangible evidence of such Confidential Information, …at the termination of employment with Employer. All…data owned, procured, or generated by Employer relating to the Confidential Information identified above, shall remain the exclusive property of Employer….
>
> **4. NON-COMPETE AGREEMENT.** Employee agrees that…for a period of two (2) years…after the termination…of Employee's employment with Employer, Employee shall not, directly or indirectly, …compete against Employer (including but not limited to engaging in any activity that could have the effect of directing business away from Employer)…or establish any business relationship…with any business entity or person in competition with Employer….
>
>> c. Employer and Employee agree that Employer competes throughout the United States, and Employee performs…services throughout the States of Kansas,

> Missouri, Nebraska, and Iowa and[1] in geographical areas of employment in which Employee has sold products or services. Employer and Employee agree that the prohibition on competition applies throughout the States of Kansas, Missouri, Nebraska, and Iowa in areas in which Employee sold/serviced Employer's products or services and/or serviced Employer's products during the twenty-four (24) months prior to the termination of Employee's employment….[2]

(Docs. # 119 at 5–7; # 121 at 6–8).

### C. MTA's Confidential Information & Substantial Relationships

As CEO of the company, and in anticipation of the October 28, 2014 hearing, Ms. Valerie Marks "asked [her team] to pull any customers with substantial relationships that were in the four state market that came on after [MTA] acquired the Moon's business." (Doc. # 96 at 28:20–23). Ms. Marks' team, presumably, narrowed the list from thousands of customers to customers with which MTA "had very active and ongoing relationships and customers who had a high degree of confidence in [MTA]" in an effort "to continue to be more and more fair because [her team] started with a very large list." (Doc. # 96 at 29:14–19). Ms. Marks, however, could not testify to the methodology employed to determine whether MTA had a substantial relationship with those particular customers. In fact, on cross examination, Ms. Marks could not testify to the nature of any relationship with any account enumerated on the customer lists. (Doc. # 96 at 30–34). Of particular interest, the list contained the United States Federal Government Department of Veterans Affairs, The United States District Court for Kansas City, the United States District Court for Topeka, and the United States District Court for Wichita. (Doc. # 96 at 30–34). When pressed, Ms. Marks admitted MTA did not—and could

---

[1] The Court notes the discrepancy between Petitioner's and Respondent's proposed findings of fact. After reviewing the pertinent contracts—specifically, MTA's Exhibit 16—the Court finds the inclusion of "and" is correct.
[2] Both Ms. White's and Mr. C. Moon's agreements have the portion reading "in areas in which Employee sold/serviced Employer's products or services and/or services Employer's products during the twenty-four (24) months prior to the termination of Employee's employment struck through. (Docs. # 119 at 6; # 121 at 7).

not—have substantial, protected relationships with the Federal Government, and that Mr. Charlie Brons would be the appropriate MTA representative to testify regarding the methodology of the list and the relationships with particular customers. (Doc. # 96 at 30–34).

MTA hired Mr. Brons in mid-June of 2013 for the position of Midwest regional manager. (Doc. # 96 at 40). As Midwest regional manager, Mr. Brons maintained customer relationships and managed the fourteen-state region from "Arkansas, Oklahoma, up to Wisconsin, a few accounts in South Dakota, and whatnot…" with his technicians and salespeople. (Doc. # 96 at 40–41). However, Mr. Brons could not testify to the amounts of revenue MTA lost or that the revenue was diverted to the Respondents. (Doc. # 96 at 80). Throughout his testimony, Mr. Brons could not identify customer information beyond that on the list, with little exception, despite holding the title of Midwest regional manager for approximately sixteen (16) months. The majority of these accounts derived revenue from repeat business. (Doc. # 96 at 45). Mr. Brons considered these customer relationships substantial and the information needed to maintain the repeat business confidential; for instance, inspection dates and equipment eventually due for replacement. (Doc. # 96 at 47–49). However, on cross examination, Mr. Brons admitted that information was in the possession of the customer, and the customer could share that information with any other business—either to obtain a lower bid, or even if the business telephoned the hospital and asked for the inspection date. (Doc. # 96 at 62–63).

Moreover, Mr. Brons admitted that portions of his declaration—one made under penalty of perjury and upon which this Court relied to grant MTA initial njunctive relief—were not entirely true. For example, in his declaration, Mr. Brons declared the bid process is closed and competing companies are not privy to competing bids or bid components, (Docs. ## 9 at 68; 96 at 65); however, on cross examination, Mr. Brons clarified that his declaration was mostly

true—that competitors were not privy to competing bids or bid components, but, under certain circumstances, some vendors would show competitors the competing bids for a "last look" to allow the competitor to underbid the competition. (Doc. # 96 at 66). While this section of the declaration begins with the "usual process by which healthcare facilities obtain medical gas equipment and/or testing services is through the solicitation of closed bids" from contractors, the declaration, in light of Mr. Brons' testimony, misleads the reader; Mr. Brons declared:

> The process by which companies, including MTA, submit bids for medical gas equipment and training is as follows: the companies develop a quote for equipment and services based on labor and equipment cost. The bids are then submitted to the customer for selection. <u>This is a closed bid process where competing companies do not know one another's bids or the bid's components</u>.

(Doc. # 9 at 68) (emphasis added). The declaration fails to demonstrate the relationships between some entities with respect to the "last look" option in the bidding process, effectively nullifying Mr. Brons' declaration that the system is a closed bid process and competitors do not know one another's bids or the bid's components.

The testimony of MTA employee Nancy Hunter was limited, but still failed to explain satisfactorily the process by which MTA determined the customer lists reflected substantial relationships with MTA customers and the damages that flowed therefrom—an essential element of MTA's causes of action. In certain instances, the customer list reflected Mike Dolack, Charlie Brons, and other MTA employees were the direct contacts for the accounts—not the Respondents. (Doc. # 97 at 96–97). The customer list included these amounts, yet Ms. Hunter could only speculate as to the interactions the Moons may have had with these clients, mostly based on Mr. Moon's managerial capacity. (Doc. # 97 at 96–97). Ms. Hunter further testified the list was not based on revenue, but rather "the fact that it's an active ongoing relationship" and the revenue could vary between $1 or $1,000,000. (Doc. # 97 at 100). Ms. Hunter could not

confirm whether the Moons were conducting business with any of the customers on the list beyond "what's been produced in the documents." (Doc. # 97 at 99–100). Ms. Hunter further admitted she did not know the locations of the customers, but that the customers were located "in the Midwest region, which…consists of 14 states." (Doc. # 97 at 99). Ms. Hunter confirmed Mr. Brons' testimony that hospitals and clients with which MTA conducts business are not precluded from disclosing bid and project information—including prices—to MTA's competitors. (Doc. # 97 at 91–92). Ms. Hunter testified the Moons "should not be allowed to conduct business with any cancer care facility within the Midwest region, those 14 states," which could be outside the four-state region at issue in this case. (Doc. # 97 at 103).

Ms. Hunter conceded that while a contractor may not have obtained work for a hospital, such as J.M. Brennan, another contractor could have been awarded that job, and MTA would not have lost any revenue. (Doc. # 97 at 104–109). Ms. Hunter admitted contractors hire different individuals and the prices vary depending on the job. (Doc. # 97 at 110). Ms. Hunter confirmed Mr. Brons' testimony that MTA is not the only company registered to conduct business with the Department of Veterans Affairs—an entity with which MTA claimed to have a substantial, protected relationship. (Doc. # 97 at 114). Ms. Hunter, after repeated questions from opposing counsel, reluctantly admitted that MTA was not the only entity authorized to conduct medical gas business with the Department of Veterans Affairs. (Doc. # 97 at 115–116). Ms. Hunter further admitted MTA competes against companies to earn the business of Rand Construction Company, another company with which MTA alleges it has a substantial, protected relationship, and that any individual could likely obtain information for those bids through publicly available information. (Doc. # 97 at 116–119). Ms. Hunter refused to acknowledge the varying degree of relationships between one customer that might conduct thousands of dollars of business and

another that historically conducted hundreds of thousands of dollars of business, simply stating that MTA has a substantial relationship with all customers because at any given time an MTA customer could decide to build a hospital. (Doc. # 97 at 118–119). Ms. Hunter could only speculate why J.M. Brennan, Titan Plumbing, and other vendors ceased business with MTA, noting the business "just vanished" and "the Moons are taking care of those customers now." (Doc. # 97 at 80–81).

Deposition testimony of Robert Ross Williams, who is employed with Artech Environmental, revealed that companies occasionally bid against one another for projects in the industry, (Doc. # 96 at 218–219), and any competitor could "[o]pen up the yellow pages under hospitals…[d]rive down the road and look for every blue sign that says H, turn left or right, pull into the front door, and that's [a] customer." (Doc. # 96 at 226–227). The deposition testimony demonstrated that any individual or business could literally walk into a hospital, speak with an operations, equipment, or engineering manager, and ask for an appointment or opportunity to discuss providing services, including annual evaluations and support for new construction at any particular hospital. (Doc. # 96 at 226–228). The deposition testimony revealed that Artech was given the "last look" opportunities Mr. Brons described in his testimony—where a hospital or customer would disclose the lowest bid and offer the project to a competitor if the competitor underbid the lowest bid, (Doc. # 96 at 229), that the methodology for calculating and producing a bid varied day-to-day, project-to-project, (Doc. # 96 at 230), and the demands of clients and the industry fluctuates greatly throughout the year. (Doc. # 96 at 231–232).

Deposition testimony of John Michael Brennan, III, who is the co-president of and corporate representative for J.M. Brennan, revealed that J.M. Brennan primarily conducted business with Moon Medical for a number of years, then MTA due to MTA's acquisition of

Moon Medical and Mr. Moon's employment with MTA. (Doc. # 97 at 8–10, 16). Mr. Brennan characterized the relationship with Mr. Moon as longstanding and good. (Doc. # 97 at 10). After the Respondents departed MTA, Mr. Brennan testified the relationship with MTA "went down substantially" due to a decreased comfort level and service issues with MTA. (Doc. # 97 at 16–17).

Regarding the service issues, Mr. Brennan elaborated that one MTA employee hired for gas verification was "out drinking the night before and got drunk and lost his car." (Doc. # 97 at 21–22). The following morning that MTA employee "was not up in the morning and couldn't find his car to get to the hospital to do verifications." (Doc. # 97 at 22). Mr. Brennan testified J.M. Brennan did not encounter these issues with other companies' verifiers, and that MTA's employees—save the Respondents—were not cooperative and dynamic in their efforts to address and satisfy the demands of the industry. (Doc. # 97 at 22–23). Mr. Brennan clarified that J.M. Brennan's customers are "best served by having multiple vendors in any area of business, both from a cost [and service level] standpoint." (Doc. # 97 at 26).

Deposition testimony of John Just, who is the president of and corporate representative for Just Service, Inc., confirmed the different types of bids and that not all bids are of a closed nature, especially new projects. (Doc. # 97 at 37–38). Mr. Just further testified he could not account for lost revenue between 2012 and 2014, but that Just Service, Inc., performed much less construction work and projects after 2012. (Doc. # 97 at 35).

Deposition testimony of Albert Mueller, the manager of the plumbing department at Just Service, Inc., confirmed warranty and equipment issues with MTA, as well as drunk MTA employees calling at 2:00 in the morning to ask for cab money. (Doc. # 97 at 49–50). Mr.

Mueller further confirmed that Just Service, Inc., has no exclusive relationship with MTA or any other company for service and equipment needs. (Doc. # 97 at 50–51).

STANDARD OF REVIEW

"A district court may grant injunctive relief only if the moving party shows that: (1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." Siegel v. LePore, 234 F.3d 1163, 1176 (11th Cir. 2000). "A preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly establishes the 'burden of persuasion' as to the four requisites." All Care Nursing Serv., Inc. v. Bethesda Mem'l Hosp., Inc., 887 F.2d 1535, 1537 (11th Cir. 1989). A motion for preliminary injunction is a federal procedural issue derived from Federal Rule of Procedure 65. Fed. R. Civ. P. 65; see Ferrero v. Associated Materials, Inc., 923 F.2d 1441, 1448 (11th Cir. 1991).

ANALYSIS

Based on the testimony presented at the two-day hearing from October 28, 2014, through October 29, 2014, this Court cannot find MTA has a substantial likelihood of success on the merits. MTA's causes of action are for breach, (Doc. # 5 at 18–25), an essential element of which is damages. Throughout the two-day hearing and the exhibits presented, MTA's CEO, employees, and corporate representatives presented evidence rife with inexplicable inconsistencies. CEO Valerie Marks could not explain the methodology to determine the customer list that MTA contended were substantial relationships, nor how MTA lost business

with those customers, and left that explanation to Charlie Brons and Nancy Hunter.  Mr. Brons and Ms. Hunter, similarly, could not sufficiently explain the methodology employed, nor testify that the Respondents definitively affected MTA's revenue in the specific four-state area.

Assuming, arguendo, MTA could establish a likelihood of success on the merits, MTA's bid for injunctive relief still fails, as the injury presented through testimony and evidence is speculative at best.  The basic premise MTA advanced was that the Respondents left MTA, and MTA lost business, therefore it was the misconduct of the Respondents that caused the lost business.  Representatives for J.M. Brennan and Just Services, Inc., testified their relationships with MTA dwindled not based on the Respondents' conduct, but rather the decreased level of service MTA provided after the Respondents departed MTA, and that neither had an exclusive or protected relationship with MTA.  These representatives confirmed the impeached testimony of Mr. Brons that bidding processes were not always closed, and vendors were given "last looks" in an effort to best their competitors.

The inconsistent testimony and evidence that failed to establish damages—or even the information contained in affidavits—combined with the speculative threatened injury to MTA, do not outweigh the damages the proposed injunction would cause Respondents.  Accordingly, it is **ORDERED** and **ADJUDGED** that MTA's request for preliminary injunction is **DENIED**.  It is **FURTHER ORDERED** that MTA's Motion to Strike (Doc. # 122) is **DENIED** as moot.  DONE and **ORDERED** in Chambers, in Tampa, Florida, this 30th day of January, 2015.

ELIZABETH A. KOVACHEVICH
UNITED STATES DISTRICT JUDGE

Copies to: All parties and counsel of record